**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| TODD A. POPP, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE |
| | : | |
| OHIOHEALTH CORP., | : | MAGISTRATE JUDGE |
| | : | |
| Defendant. | : | **JURY DEMAND ENDORSED HEREON** |

**COMPLAINT**

**I.      Preliminary Statement**

1.      This action seeks economic, compensatory, and punitive damages; declaratory, injunctive, and equitable relief; pre-judgment and post-judgment interest; and attorneys' fees and costs for the violations of Title VII of the Civil Rights Act of 1964 and the Ohio Laws Against Discrimination committed when at least a motivating factor for Defendant OhioHealth Corp.'s termination of Plaintiff Todd A. Popp was his sex, rather than the pretextual charge of dishonesty regarding his social media, and, consistent with a pattern of insensitivity for his sexual orientation, the investigation upon which OhioHealth relied was neither reasonably informed nor considered but instead was tainted by bias against homosexuality and revulsion about gay sexual activity and pictures that would not have motivated OhioHealth had heterosexual sexual activity and pictures been investigated.

**II.     Jurisdiction and Venue**

2.      This action brings discrimination claims against Defendant under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., pursuant to charge affidavits timely dual filed on

-1-

March 5, 2024, with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), and right-to-sue notices issued by the OCRC on May 1, 2025 and the EEOC on July 1, 2025, attached as Exhibits A and B respectively, after OCRC found probable cause that OhioHealth had discriminated against Mr. Popp.

3.      This Court has jurisdiction over this action by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

4.      Declaratory, equitable, and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202.

5.      Economic, compensatory, and punitive damages may be awarded under Title VII, 42 U.S.C. § 1981a, and Ohio common law.

6.      Costs and attorneys' fees may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(k); Fed. R. Civ. P. 54; 42 U.S.C. § 1988; and Ohio common law.

7.      Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in Franklin County, Ohio, where OhioHealth is headquartered and employed Mr. Popp at its medical center in Westerville, Ohio.

## III.    Parties

8.      Plaintiff Todd A. Popp, a male known by Defendant to have a sexual orientation of homosexuality, was employed as a Physician Practice Manager in the Physician Group Neuroscience by OhioHealth in Westerville, Ohio, from November 2014 until his termination on November 27, 2023.

9.      Defendant OhioHealth is a nationally recognized, not-for-profit, charitable, healthcare outreach of the United Methodist Church; employs approximately 35,000 associates, physicians and volunteers; owns a network of 16 hospitals, three joint-venture hospitals, and more

than 200 ambulatory sites and other health services spanning a 50-county area; ranks as the largest health system in the Central Ohio area; employed Mr. Popp at its medical center in Westerville, Ohio; and has, at all times relevant to this Complaint, been an employer covered by Title VII of the Civil Rights Act of 1964 and the Ohio Laws Against Discrimination.

## IV.    Facts

10.    In November 2014, Defendant hired Mr. Popp as a Physician Practice Manager for its Physician Group Neuroscience at its Westerville Medical Campus.

11.    Mr. Popp's job duties involved directing, coordinating, and managing all practice functions, including ultimate responsibility for financial accounting activities, operating and capital budgets and implementing and supporting OhioHealth policies and procedures.

12.    Throughout his tenure, Mr. Popp competently performed those job duties with ratings of "exceeds expectations" or "meets expectations" in OhioHealth's performance evaluations.

13.    The grounds OhioHealth asserted for terminating Mr. Popp were not directly based on his performance of his job duties and instead were asserted by Investigator Maryam Shahid of OhioHealth's Advice and Counsel Center, a center within OhioHealth's Human Resources department, and his supervisor, Amy Minser, OhioHealth's System Director, Physician Practice Operations, to be dishonesty regarding his social media activity, specifically explicit sexual content and references to his affiliation with OhioHealth.

14.    In 2020, OhioHealth received an anonymous complaint about political posts on Mr. Popp's Facebook social media, investigated him, and coached him on the appropriate use of social media.

15. OhioHealth investigated the anonymous complaint, traced it to a staff member angry at Mr. Popp, deemed it retaliatory and harassing, and told Mr. Popp that it would be removed from his personnel file.

16. Out of an abundance of caution and to avoid any more complaints, Mr. Popp and his husband then changed all the settings in their social media to "private."

17. Referring to the 2023 complaint, Mr. Popp responded negatively on February 10, 2021, to a question from "Dr. Bear" regarding whether "Dr. Bear" should permit co-workers and patients to have access to his Twitter account where he had posted fully nude pictures with his face visible.

18. Prior to the decision to terminate Mr. Popp, OhioHealth had reviewed this social media post he made on February 10, 2021, and Investigator Shahid concluded that, in her opinion, anyone aware of Mr. Popp's employment with OhioHealth would perceive the post as being connected to the organization,

19. In making its decision to terminate Mr. Popp, OhioHealth failed to consider that his February 10, 2021, posting corroborated his statement that his social media account had been designated as "private" for three or so years.

20. In making its decision to terminate Mr. Popp, OhioHealth did not contact his husband to inquire about whether his social media account had been designated as "private" for three or so years.

21. In making its decision to terminate Mr. Popp, OhioHealth did not pursue whether his "X" or "Twitter" page had been designated as "private" by asking him to demonstrate the designation, looking to see when that designation had been made, or having "X" or "Twitter" provide that information with his consent.

22. At all times relevant to his Complaint, Mr. Popp was ready, willing, and able to facilitate the investigation into his social media posting.

23. The "X" or "Twitter" social media site represents that designating an account as "private" will limit posts to followers and prevent a search engine from finding them, though profile pictures, biography, and the follower/following count will remain public.

24. Ways exist to circumvent a "private" designation, including being accepted as a follower under a fake identity, using tools such as uMobix, which offers universal monitoring software, and having an individual known to be a follower copy and share.

25. Mr. Popp was not aware that his "private" designation on "X" or "Twitter" had been breached.

26. In November 2023, a complainant reported to OhioHealth that he had seen sexually explicit photos and comments on Mr. Popp's Twitter account.

27. That complaint was assigned by OhioHealth's Advice and Counsel Center to Investigator Shahid for investigation.

28. Investigator Shahid told Mr. Popp that the complainant was anonymous.

29. The complainant was not anonymous and instead was known by name and contact information to OhioHealth.

30. Investigator Shahid reviewed a former Twitter page of Mr. Popp and reported that she had found a picture of him in his OhioHealth office with his OhioHealth badge visible and several comments by Mr. Popp accompanying sexually explicit photographs.

31. The picture was actually of poor quality, did not include any OhioHealth branding, and had a badge so pixelated that, no matter how enlarged, OhioHealth branding or Mr. Popp could not be identified.

32. Investigator Shahid characterized Mr. Popp's page as a publicly accessible account.

33. Mr. Popp was confounded when Investigator Shahid told him what she had found because he knew his page had been designated as "private" since 2020.

34. Mr. Popp asked Investigator Shahid to show him a picture of him in his OhioHealth office with his OhioHealth badge visible.

35. Investigator Shahid had repeatedly referred to the photograph and told Mr. Popp that she had taken several screen shots from his Twitter account.

36. During her interview with Mr. Popp, Investigator Shahid could not access his page.

37. Investigator Shahid immediately accused Mr. Popp in words to the effect of having "done something to block me from accessing your account…what did you do?!"

38. Mr. Popp answered that he had not done anything, that they were on camera, visible to each other, and she could see that he had not done anything.

39. Investigator Shahid asked Mr. Popp to access his page during the interview, and he did so, seeking a picture of him in his OhioHealth office with his OhioHealth badge visible.

40. All Mr. Popp could find was a picture of him in his office with his face and a small portion of his badge that was obscured, of poor quality, and pixelated in a way that prevented a clear reading of OhioHealth or identification of him.

41. Investigator Shahid then accused Mr. Popp of changing the designation of his page to private when he learned he was being investigated and pixelating the picture of his badge.

42. Mr. Popp explained that his social media account had been designated as "private" for three or so years.

43. Mr. Popp never pixelated his picture.

44. Investigator Shahid had captured screen shots of some of Mr. Popp's written responses to sexually explicit postings by others.

45. Mr. Popp did not respond with sexually explicit images of himself.

46. Investigator Shahid then admitted that she had not captured a screen shot of a picture of Mr. Popp in his OhioHealth office with his OhioHealth badge visible.

47. During the investigation, OhioHealth did not share with Mr. Popp the identity of the complainant.

48. The complainant did not capture a screen shot of the picture of Mr. Popp in his OhioHealth office with his OhioHealth badge visible.

49. Mr. Popp does not know the complainant, has never met the complainant, and does not understand why the complainant would actively seek any information on any social media site about Mr. Popp or why the complainant was focusing on Mr. Popp.

50. During his interview with Investigator Shahid, Mr. Popp was not told that OhioHealth considered whether the complainant had a personal grudge against Mr. Popp, an antipathy to homosexuality and/or same-sex imagery, or a political agenda.

51. A reasonably informed and considered investigation would have determined whether the complainant had a personal grudge against Mr. Popp, an antipathy to homosexuality and/or same-sex imagery, or a political agenda.

52. At all times relevant to this Complaint, OhioHealth had a "Social Media" policy, No. OH.POL.HR-703.001.

53. To determine whether Mr. Popp had violated its Social Media policy, OhioHealth focused on sexually explicit postings by others that Mr. Popp had commented upon.

54. The pertinent purpose of the Social Media policy was that "associates understand OhioHealth's expectations concerning their personal engagement in online communities."

55. The policy consisted of two tiers: "When such communications are made on behalf of OhioHealth, they need to be consistent with OhioHealth policies and standards. When physicians, associates, or volunteers participate in online communities in a personal capacity, their communications should adhere to the basic guidelines explained in this policy."

56. None of Mr. Popp's posts were made on behalf of OhioHealth or could have reasonably been perceived by a viewer as on behalf of OhioHealth.

57. All the posts investigated by OhioHealth regarded homosexuality and personal relations between gay men.

58. Under the heading "Personal Communications," the Social Media policy prohibited representing any personal opinion or statement as the policy or view of OhioHealth.

59. At no time did Mr. Popp's posts indicate that his policies or views were those of OhioHealth, nor could any of his comments or posts have been reasonably perceived as representing OhioHealth's policies or views.

60. The Social Media policy prohibited communicating online in ways that "are obscene . . . or profane."

61. OhioHealth did not conclude that Mr. Popp had violated its Social Media policy in what he posted, and what he posted was neither obscene nor profane in the way those terms are reasonably understood.

62. Mr. Popp has observed approximately 40 publicly accessible social media posts containing sexually suggestive or provocative images and comments made by various OhioHealth employees.

63.     Many of these posts directly identified the individuals as employees of OhioHealth.

64.     The content of those posts varied in nature, including both heterosexual and homosexual themes.

65.     Mr. Popp was not told during the investigation of his posts that other OhioHealth employees have been accused of and/or investigated for posting opposite-sex sexually explicit pictures and/or replies or comments regarding heterosexual sexual practices.

66.     During the course of the investigation, Investigator Shahid stated that she had examined and assessed what she characterized as Mr. Popp's "desires", "fantasies," and "sexual behavior."

67.     Investigator Shahid never indicated to Mr. Popp that she or OhioHealth would explore the desires, fantasies, and/or sexual behavior of employees who had been accused of and/or investigated for posting sexually explicit pictures, and/or replies or comments regarding heterosexual sexual practices.

68.     Mr. Popp was extremely uncomfortable with the questions Investigator Shahid asked, and her visible, visceral, and negative verbal reactions to his answers made it clear that she was uncomfortable, strongly disapproved of, and was personally offended by the fact that Mr. Popp was homosexual and had posted sexually explicit photographs and comments.

69.     The context of the investigation was OhioHealth's insensitivity during his tenure toward his homosexuality.

70.      Director Minser mentored Mr. Popp when he first started at OhioHealth where she served as Manager of the Westerville Neurology team and trained him to replace her when she left to manage at Riverside and reduced her Westerville presence to–providing weekly managerial oversight of the ALS Clinic, which was in the same office and supported by the same office staff.

71. During his first meeting with Director Minser and Elizabeth (Liz) Paloski, who was manager of the Grant Neuroscience office, Director Minser leaned toward Mr. Popp and asked him whether he had met Dr. Chris Karas, to which he replied that he had not met him.

72. Director-Minser then said words to the effect of, "You're gay, right? I need you to use your 'gaydar' to tell me if Dr. Karas is gay. We all think he's gay, but I need you to confirm it for me. I need to know if Dr. Karas is gay, and if you can tell me about any of the other doctors, I need to know."

73. Mr. Popp was shocked to be asked such a personal and unprofessional question.

74. Mr. Popp had not suggested before then that he had "gaydar" or any similar ability to distinguish between homosexual and heterosexual individuals.

75. Mr. Popp viewed the notion of "gaydar" as stereotypical, steeped in the idea that male homosexuals are sexual predators constantly looking for other men.

76. Mr. Popp was unfamiliar with Director Minser or Manager Paloski and did not welcome Director Minser's conversation about his sexual orientation or concern about the sexual orientation of others.

77. Mr. Popp replied, "Are you kidding me? Is my sexuality going to be a problem with you, because it doesn't seem to be an issue with OhioHealth?"

78. Manager Paloski, who remained silent, appeared to be uncomfortable with the conversation.

79. Mr. Popp added that "gaydar" was not a real thing and he knew nothing about Dr. Karas.

80. Mr. Popp explained that, even if he knew someone was gay, he would not "out" that person.

81. Director Minser was undaunted and persisted in asking Mr. Popp to identify which doctors were gay, "because she needed to know."

82. Mr. Popp reiterated his position that discussing sexuality was inappropriate and he would not participate in doing so.

83. As the years passed, Director Minser never forgot that conversation and Mr. Popp's defiance.

84. During the first months of his employment, Mr. Popp and Director Minser worked together while she was mentoring and training him, and she had a habit of coming up behind his desk and making a point of touching him,  resting her hands on his shoulders or arms.

85. Director Minser started referring to Mr. Popp as her "work husband."

86. Mr. Popp did not welcome her physical touching or her comments about him being her "work husband" and asked her to stop, explaining that the touching and comments made him uncomfortable.

87. Director Minser responded by reaching out and deliberately touching his arms with both hands, rubbing them up and down, and saying words to the effect of, "THIS makes you uncomfortable?"

88. Mr. Popp pulled away from her, answered that the touching did make him feel uncomfortable, and again asked her to stop.

89. From Mr. Popp's observation, Director Minser did not touch other employees the way she did him or refer to anyone else as a "work husband."

90. Mr. Popp got the impression that Director Minser believed touching a gay employee and referring to him as a "work husband" was not sexual harassment because she was heterosexual and no romantic involvement would occur.

-11-

91.     In December 2014, at a business holiday luncheon hosted by Director Julie Bain at the Polaris Grill, where Mr. Popp was the only male team member, Director Minser stood, walked behind him, put her hands on his shoulders, and proclaimed to the other female managers words to the effect of, "This is MY work husband - he's MINE and the rest of you better keep your hands off!"

92.     Mr. Popp found her actions and words terribly awkward, including its implicit ridicule of him, a gay man, being the object of the female managers' desires, though the others laughed them off.

93.     In conversations with Mr. Popp, Director Minser would belittle other managers, such as labeling one manager "a cunt" and Manager Paloski "stupid" and a "terrible manager."

94.     Mr. Popp defended Manager Paloski, saying she had been helpful to him, and Director Minser amplified her characterization by saying she was one of the worst managers she had ever worked with, and Director Minser would get rid of her if she ever had the chance.

95.     Director Minser then referred to Cindy Lauer, a peer neurology manager, as the "dyke" on the team.

96.     Mr. Popp told Director Minser that he found the word "dyke" to be offensive.

97.     Manager Lauer was openly gay but was not referred as a "dyke."

98.     Director Minser laughed and said words to the effect of, "Well you're gay - but she's a dyke! Wait until you work with her some more."

99.     Mr. Popp responded that Director Minser should not use words like that and he found them offensive and did not use them, and she continued to laugh.

100.    For a period, Director Minser and Mr. Popp were peers, each managing separate neurological physician practices at separate hospital locations.

101     On one occasion when they saw each other at Riverside Hospital, then-Manager Minser told Mr. Popp that relationships change, he asked what she meant, and she got up from her seat and told Mr. Popp, who was seated, "Give me a hug!"

102.    Mr. Popp found the tone and content authoritative rather than congenial, but he reluctantly acquiesced and immediately left.

103.    Mr. Popp determined that avoiding then-Manager Minser in the future would be the best course of action.

104.    Not long after, OhioHealth Business Operations Manager Shellie Wheeler called Mr. Popp and reported that then-Manager Minser and Manager Paloski complained about his overreliance on their assistance and inability to learn about OhioHealth practices.

105.    Mr. Popp asked Manager Wheeler why they had not just told him about that and said that he felt uncomfortable working with then-Manager Minser.

106.    Mr. Popp shared with Manager Wheeler examples of then-Manager Minser's behavior and his attempts to avoid her.

107.    Manager Wheeler advised Mr. Popp that avoiding then-Manager Minser was a good idea.

108.    In a later call from Manager Wheeler and Director Bain, they reported that then-Manager Minser had complained to them that the Westerville team was unhappy with Mr. Popp and his management style.

109.    Mr. Popp urged Manager Wheeler and Director Bain to have then-Manager Minser tell his staff to report directly to him any problems they had, and a meeting between then-Manager Minser and Mr. Popp was scheduled.

110. At the meeting, then-Manager Minser was openly hostile to Mr. Popp, being argumentative and defensive and ultimately got up during the meeting and walked out, closing his office door and shutting him inside.

111. When Mr. Popp opened the door and asked whether they could finish their conversation, then-Manager Minser abruptly picked up what she had brought, creating a scene in the nurses' station, and stormed out, saying "No, I'm leaving."

112. Mr. Popp relayed what had happened to Director Bain, described the hostile, inappropriate, and awkward past interactions with then-Manager Minser, and said he would try to avoid her when he could.

113. Director Bain told Mr. Popp that avoiding then-Manager Minser made sense.

114. A later holiday celebration included Director Minser, who had just been promoted to Director, and she came up to Mr. Popp and others he was talking with and said words to the effect of, "Todd - you've lost weight - you look good - you look really good."

115. Mr. Popp had lost 40 pounds over a few months, but he was made uncomfortable by Director Minser talking about his appearance.

116. Mr. Popp had never invited, solicited, or welcomed any comments from Director Minser regarding his personal appearance.

117. In order to avoid any misunderstanding or offense, making comments about the personal appearance of subordinates and coworkers was generally not done at OhioHealth.

118. In 2017, OhioHealth realigned each manager in the neurology department other than Mr. Popp to a different office, and Director Bain explained that he was doing such a good job at the Westerville and Delaware offices that they wanted him to stay in his assignment.

-14-

119. Director Bain was senior to then-Director Minser and chose which managers would report to her.

120. Director Bain chose to have Mr. Popp report to her, and he told her how much he appreciated that because, if ever he had to report to Director Minser, he would probably look for another job.

121. Director Bain acknowledged to Mr. Popp that she was fully aware of the prior difficulties and issues involving Director Minser and explained that, by retaining him within her leadership portfolio, he would be shielded from future interactions or oversight by Director Minser.

122. In late 2019 or early 2020, Director Bain called Mr. Popp to tell him that another realignment was occurring, and he would be reporting to Director Minser.

123. Mr. Popp explicitly expressed his concern that Director Minser would create or contribute to a hostile work environment if she was placed in a position of authority over him and that he felt he would have a "target on his back," fearing it would only be a matter of time before she sought to remove him from his position through retaliatory or unjustified means.

124. Director Bain attempted to reassure Mr. Popp, saying that she had spoken with Director Minser and believed having her supervise him would be alright.

125. Director Bain said that Director Minser would invite Mr. Popp to lunch and discuss the transition.

126. Mr. Popp reaffirmed his ongoing concerns, apprehension, and anxiety, and Director Bain repeatedly attempted to reassure him about potential retaliation and a hostile work environment under Director Minser.

127. Soon thereafter, Director Minser met Mr. Popp for lunch at the OhioHealth Westerville facility.

128. During this meeting, Director Minser acknowledged that their professional relationship had been tenuous in the past.

129. Director Minser told Mr. Popp that she wanted to put all that behind them and start fresh.

130. Director Minser asked Mr. Popp whether he could report to her and, before he could respond, said words to the effect of, "If you can't, I will give you a positive recommendation if you want to try to transfer somewhere else internally."

131. Based on their past, her tone, facial expression, and body language, Mr. Popp believed Director Minser was threatening him and precluding any dialogue about safeguards or ways to truly put the past tenuous relationship behind them.

132. Director Minser soon removed Mr. Popp from managing both the Delaware and Westerville offices, telling him that the expansion in Westerville had to be his focus.

133. Mr. Popp asked to maintain both offices, stressing his successful team in Delaware and efficient and effective management, but Director Minser denied his request.

134. Director Minser replaced Mr. Popp as Practice Manager of the Delaware office with a younger, less experienced female Manager.

135. Mr. Popp offered to train his Delaware replacement, but Director Minser rejected his offer.

136. Mr. Popp soon learned from the Delaware team that his replacement was having difficulties, and Director Minser then terminated her before the end of her probationary period.

137. Director Minser asked Mr. Popp to provide transitional managerial oversight in Delaware, which he did.

138. A few days later, Director Minser offered to return Delaware to Mr. Popp rather than hire another manager or a part-time manager

139. Mr. Popp accepted that offer conditioned on his retaining both the Delaware and Westerville positions, and Director Minser agreed.

140. Based on her facial expressions, body language, and indication that she had made a mistake in appointing his replacement, Mr. Popp had the distinct impression that her acceptance was begrudging and necessitated by the circumstances rather than genuine support for his leadership and capabilities.

141. When OhioHealth launched its Diversity & Inclusion initiative, Mr. Popp actively participated by authoring and distributing educational and informational materials, and Director Bain recognized his efforts and achievements and supported them.

142. Director Minser withheld both recognition and support for Mr. Popp's efforts and achievements on Diversity & Inclusion.

143. As the neuroscience division continued to grow and the number of neuroscience managers doubled, Mr. Popp observed that only female managers were being hired and brought his concern to Director Bain and Director Minser.

144. For years, Mr. Popp had been the only male manager on the team, and he asked them whether he was a "token."

145. Two male managers were soon hired by OhioHealth, and, when Mr. Popp offered to mentor one of them, Director Minser flatly rejected his offer, saying she did not want Mr. Popp to assist the new manager in any way.

146. Director Minser did not explain her rejection, but Mr. Popp suspected that his being gay made her resist having him mentor another male, perpetuating the stereotype of gay men looking to seduce others.

147. On November 2, 2023, Director Minser called Mr. Popp to ask whether he knew Investigator Maryam Shahid and, after he said he did not recognize her name, she added that Investigator Shahid was from Human Resources Advice and Counsel Center and investigating his social media use.

148. Investigator Shahid subsequently contacted Mr. Popp by a Teams video meeting to discuss the complaint about his postings.

149. During the conversation, Investigator Shahid appeared noticeably uncomfortable when addressing the subject matter, frequently pausing and audibly taking deep breaths before referencing the content she claimed to have viewed on Mr. Popp's former Twitter account.

150. Each time Investigator Shahid referred to sexually explicit pictures, she exhibited visible physical discomfort, including drawing back, making expressive facial gestures, and reacting with apparent unease.

151. Investigator Shahid repeatedly characterized the content as "sexual," using phrases such as "your 'sexual' posts", "your 'sexual' comments", and "your 'sexual' responses", without providing specific details or context.

152. Mr. Popp explained that he had an old Twitter account, one he had not used for two years, but it contained no inappropriate pictures of him, and all his social media accounts had been set as "private" since 2020 as far as he knew.

153. Mr. Popp told Investigator Shahid that he had no idea why anyone would seek information about him online or access his account.

154.    Mr. Popp asked her whether the complainant's motivation had been learned, and she responded with words to the effect of, "The ACC is not in the business of determining motivation, the ACC is in the business of investigating complaints and making recommendations about what we find."

155.    Mr. Popp responded that the process was flawed and asked to see the photos.

156.    Investigator Shahid produced only one photo that she deemed "nude": it was a post of his abdomen showing his weight loss.

157.    Mr. Popp told her he was neither nude nor displaying sexual content and the posting was to a friend during a discussion about their individual weight loss journeys.

158.    The photo of Mr. Popp did not include his face, genitals, or any reference to OhioHealth.

159.    Investigator Shahid then told Mr. Popp that, knowing about the 2020 complaint about his posting and the coaching he had received for that, she decided to do a "deep dive" into his Twitter account and read his replies to whatever was posted.

160.    Investigator Shahid noticeably bristled when she referred to Mr. Popp's sexual posts and exchanges.

161.    Even though Investigator Shahid's body language and facial expression reflected her discomfort at discussing sexual matters, she pursued what she characterized as sexual content.

162.    Mr. Popp found the conversation intrusive, unfair, and focused more on homosexuality and revulsion about gay imagery, including posts from individuals and his comments, than any real concern about OhioHealth being connected to the pictures and replies.

163.    Investigator Shahid told Mr. Popp that she would take her findings to OhioHealth's Human Resources Director and to Director Minser.

164. At the conclusion of the meeting, Mr. Popp acknowledged Investigator Shahid's apparent discomfort and responded with empathy, expressing his regret for any content she may have seen or read that caused her visible unease, and reaffirmed his deep respect for OhioHealth, stating that he would never intentionally engage in any behavior that could bring harm to the organization.

165. Investigator Shahid did not respond to Mr. Popp's remarks and concluded the conversation without offering any further comment.

166. On November 17, 2023, Director Minser convened a meeting with Mr. Popp and Human Resources representative Emmalee Ponzio.

167. Director Minser reported that Advice and Counsel had recommended termination of Mr. Popp, and she had decided to follow that recommendation and terminate him.

168. At no point during the meeting did either Director Minser or HR representative Ponzio pose any questions to Mr. Popp or provide him with an opportunity to clarify or respond to any findings related to the investigation.

169. When Mr. Popp stated that he wished to appeal the decision, he was informed that, as a manager, he had no right to appeal.

170. Mr. Popp then requested to speak with an Associate Advocate; however, this request was denied, and he was told that, because he was no longer employed, he was not eligible to speak with or be represented by an Associate Advocate.

171. Mr. Popp refused to sign the termination notice and, after getting his coat, told them words to the effect of, "This is the best job I've ever had, and I would never do anything to harm OhioHealth."

172.     Mr. Popp was replaced in the Delaware and Westerville manager positions by two women who were far less qualified and experienced than he was, and neither was known to be homosexual.

173.     Mr. Popp sought unemployment compensation benefits, and the Ohio Department of Job and Family Services determined on February 26, 2024, that he was discharged without just cause.

174.     Despite the exercise of reasonable diligence, Mr. Popp has been unable to secure a position comparable in terms and conditions to the one he held at OhioHealth.

175.     As a proximate result of OhioHealth's sex discrimination, Mr. Popp has suffered emotional distress, frustration, and humiliation.

176.     OhioHealth acted in reckless disregard of Mr. Popp's right to equal employment opportunity.

## V.     Claim for Relief: Discriminatory Termination

177.     Plaintiff incorporates, as if fully realleged, paragraphs 1-176 of this Complaint.

178.     By terminating Plaintiff when at least a motivating factor was his sex, rather than the pretextual charge of dishonesty regarding his social media, and, consistent with a pattern of insensitivity for his sexual orientation, an investigation that was neither reasonably informed nor considered but instead was tainted by bias against homosexuality and revulsion about gay sexuality that would not have motivated OhioHealth had heterosexuality and opposite-sex sexuality been investigated, OhioHealth has violated Title VII of the Civil Rights Act of 1964 and the Ohio Laws Against Discrimination.

## VI.     Prayer for Relief

WHEREFORE, Plaintiff prays that this Court:

a.       declare that Defendant has violated Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq.*, and the Ohio Laws Against Discrimination;

b.        order such injunctive and equitable relief as will make Plaintiff whole for

Defendant's violations, including reinstatement with full back pay and benefits and protection from

continuing harassment, and pre- and post-judgment interest;

c.       award compensatory and punitive damages in excess of $75,000;

d.       allow reasonable attorneys' fee and costs; and

e.       grant such other relief as the Court may deem appropriate.

Respectfully submitted By,

*/s/ Helen M. Robinson*
Helen M. Robinson (0097070)
(*hrobinson@marshallforman.com*)
John S. Marshall (0015160)
(*jmarshall@marshallforman.com*)
Edward R. Forman (0076651)
**OF COUNSEL**                                      (*eforman@marshallforman.com*)
Louis A. Jacobs (002101)                         Samuel M. Schlein (0092194)
(*LAJOhio@aol.com*)                              (*sschlein@marshallforman.com*)
177 19th St., Apt. 9C                              Madeline J. Rettig (0098816)
Oakland, CA 94612                                (*mrettig@marshallforman.com* )
(614) 203-1255                                    MARSHALL FORMAN AND SCHLEIN LLC
Fax (510) 250-9007                               250 Civic Center Dr., Suite 480
                                                 Columbus, Ohio 43215-5296
                                                 Phone: (614) 463-9790
                                                 Fax: (614) 463-9780

## JURY DEMAND

Plaintiff hereby requests a trial by a jury of eight (8) persons.

By:  */s/ Helen M. Robinson*
Helen M. Robinson (0097070)

-22-